# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MARIAN KEATING,                               )
                                              )
                    Plaintiff,                )
                                              )
        v.                                    )
                                              )        Case No. 96 C 3817
                                              )
HENRY PAULSON, Secretary of the United        )        Judge Joan B. Gottschall
States Department of the Treasury,            )
                                              )
                    Defendant.                )
                                              )
                                              )

## MEMORANDUM OPINION AND ORDER

Plaintiff Marian Keating brought suit against defendant Henry Paulson, Secretary of the United States Treasury Department, alleging violation of the Civil Rights Act of 1964. Specifically, Keating, who is white, alleges that she was unlawfully denied promotion, because of her race, to a management position in the consolidated Chicago Regional Office of the Internal Revenue Service's Facilities Management Branch, in favor of Melinda Geddes, an African-American. After a two and a half day bench trial and oral arguments, the court finds that Keating has failed to meet her burden of proof by providing insufficient evidence to enable a reasonable finder of fact to determine that the IRS intentionally discriminated against her because of her race. The court therefore enters judgment in favor of the defendant.

## I. FINDINGS OF FACT

In the late summer of 1994, a substantial consolidation and reorganization of the administrative structure of the Internal Revenue Service ("IRS") Regional and District

Offices in the greater Chicago area resulted in the creation of a new management position. The organizational title of the vacancy was Chief of the Facilities Management Team, which was a section of the IRS's Facilities Management Branch. Joint Ex. 2. The official title of the new position in the IRS's management structure was that of Supervisory Management Analyst, and the position was classified as GS-343-13. Joint Ex. 1. The number "343" in the classification refers to the occupation code (Management and Program Analysis) and the "13" refers to the pay grade. Joint Ex. 2; Joint Exhibit 6, 112. The position was posted on September 19, 1994. Joint Ex 1.

The duties of the new position included a broad range of managerial tasks, including space and property management at various IRS office sites, records, administration, addressing property and furniture requisitions and allocations, physical security and emergency planning, safety management, employee I.D. media, and building and transportation management. Joint Ex. 3 at 140. An important role of the person hired to fill the new position was coordinating with, and meeting the requirements of, the operating managers of the various IRS office locations within the assigned program area, known colloquially as the "customers." *Id.* Individuals desiring to apply for the position were required to submit Form 4356 (Application for Promotion/Reassignment), Form 9511 (Self Assessment of Readiness), Form 9512 (Management Achievement Program ("MAP") Entry Level Resume and Level of Readiness), and a current performance appraisal. Joint Ex. 1.

A total of nine individuals applied and were considered eligible for the position, including plaintiff Marian Keating ("Keating"). Joint Ex. 11. Keating, a white female, possesses an Associate's degree in Mid-Management. *Id.* She was, at the time of her

application, Chief of the Office Environment Section, with an official title of Supervisory Management Analyst, GS-343-12, in the Resource Management Division of the IRS Chicago District Office. *Id.* In that position, Keating's responsibilities were largely managerial, and included providing supervision and leadership to management analysts, management assistants, and employees, developing work schedules and operating plans, and conducting performance evaluations and dispute resolutions. Joint Ex. 5. Keating timely submitted the documents required to complete her application and submitted to an interview on October 25, 1994 with Ray Hambaugh ("Hambaugh"), Chief of the Facilities Management Branch ("FMB") under the new organizational plan, and Sharon Hornsby ("Hornsby"), the newly-appointed Director of Support Services of the Chicago Host Site. Joint Ex. 17; Joint Ex. 26 at 16, Joint Ex 15 at 64. However, on or shortly after October 26, 1994, Hambaugh announced to Keating that the position had gone to another applicant, Melinda Geddes ("Geddes"), an African-American female.

At that time, Geddes was a staff assistant reporting to George Davis ("Davis"), the Chief of FMB prior to the reorganization, with an occupational category rating of GS-301-12. Joint Ex. 16; Joint Ex. 13 at 210-12. The occupational code designator "301" stands for "Miscellaneous Administration and Program." Joint Ex. 6 at 112. Geddes possesses a Bachelor's degree in Elementary Education. Her position was also largely managerial; she served as executive assistant to the Chief of FMB, performed research and recommended changes in work assignment, procedures, organization, staffing. Joint Ex. 18 at 6G. Geddes acted as liaison and representative for the FMB chief and would substitute briefly as Acting Chief during periods of Davis' absence. *Id.* Geddes also timely filed the requisite application documents, with the exception that instead of filing a

Form 9512, she filed instead a Form 9512-A, a difference that the court addresses below.

Geddes was interviewed by Hornsby and Hambaugh on October 24, 1994 and was

informed shortly thereafter that she had received promotion to the new position. Joint

Ex. 15, 64.

In all, a total of nine individuals applied for the position; two were male and the

rest were female. Joint Ex. 7. Of the male candidates, one was white and the other

African-American. *Id.* Two of the females were white, including Keating, one was

Hispanic, and the four remaining candidates, including Geddes, were African-American.

*Id.* An alleged tenth candidate, Georgia Duckworth, may have been interviewed for the

position, or for another position that was being filled concurrently.[1]

## A. Keating and Geddes: A Comparison

### 1. MAP Entry Level Forms 9512 and 9512-A

Both candidates were certified by Charlene Carter ("Carter"), an IRS personnel

specialist, as being MAP-eligible for the position at issue, a prerequisite for the

promotion. Joint Ex. 11 at 221; Joint Ex. 12 at 211. MAP-eligible refers to a candidate's

having met the requirements of the Management Achievement Program for the position.

An important part of the evaluation is the MAP Entry Level Form, Form 9512 (the "9512

Form"), which is an element of the candidate's application required by the position

vacancy announcement. Joint Ex. 11 at 6C-225. The 9512 Form consists of three parts:

(1) a MAP Entry Level Resume which is completed by the candidate (Part I); (2) a MAP

Entry Level of Readiness Form with an evaluation of the candidate completed by her

---

[1] Duckworth, an African-American female, is not listed on the roster of candidates eligible for the position, but is listed on the interview schedule as applying for both the position at issue as well as the other position being filled at the same time. Joint Ex. 7; Joint Ex. 15, 64. Testimony at trial was conflicting over whether she was interviewed for the position that Keating and Geddes sought or the other position.

supervisor (Part II); and (3) a Self-Assessment of Readiness completed by the candidate (Part III). *Id.* Most relevant to this case is Part II, which is the only portion of the 9512 Form in which the candidate's managers have input. The candidate is rated across four "MAP competencies": (1) Interpersonal Skills; (2) Analysis and Decision Making; (3) Managing Systems and Organizations; and (4) Understanding IRS Operations.[2] *Id.* at 223. Within each competency, a candidate could be rated as "outstanding," "very good," "good," or "needs development." *Id.*

Keating was rated on Part II of her 9512 Form by Davis, her immediate supervisor, on September 30, 1994. *Id.* Davis' ratings of Keating were reviewed by Jacquie S. Hardy ("Hardy"), Chief of the Resources Management Division and Keating's second level manager, on the same day. *Id.* Davis ranked Keating as being "very good" in competency (1); "outstanding" in competency (2); and "very good" in competencies (3) and (4). *Id.* Hardy, in turn, ranked Keating as "good" in competency (1); "very good" in competency (2); and "very good" in competencies (3) and (4).[3] *Id.*

Geddes did not submit a 9512 Form with her application. Instead, and like all of the other African-American candidates, Geddes submitted a MAP Entry Level Form; Form 9512-A (the "9512-A Form") instead. Joint Ex. 12 at 212-17. The 9512-A Form likewise consists of three parts: (1) an Entry Level Resume (Part I); (2) an Entry Level/Level of Readiness evaluation form (Part II), and (3) a Self-Assessment of

---

[2] The subheadings which represent the criteria by which each competency is analyzed are as follows: For competency (1): Self awareness, understanding individuals, understanding groups, and communication (expressive and responsive). For competency (2): Big picture thinking skills, analytical skills, observational skills, creative thinking skills, and assessment skills. For competency (3): management information systems knowledge, change of process understanding, cultural knowledge, organizing skills, and automation knowledge. For competency (4): Customer understanding (give special attention to customer understanding when rating this competency), IRS organizational knowledge, tax law knowledge, tax administration systems knowledge, and personnel practices knowledge. Joint Ex. 11 at 223.

[3] Hardy's amendments were indicated by the annotation "Div Chief" next to the boxes checked where her evaluation differed from Davis'.

Readiness completed by the candidate (Part III). *Id.* As with Keating's 9512 Form, Part II of the 9512-A Form is most pertinent to this case. In most respects, the 9512-A Form closely resembles the 9512 Form. *Id.* at 32.5. The only significant difference between the two is the qualities by which the candidates are rated by their managers. Instead of the four categories of "MAP competencies," the 9512-A form features four corresponding categories of "MAP attributes." *Id.* These are: (1) Interpersonal Focus; (2) Productivity Focus; (3) Value Focus; and (4) Workforce Focus.[4] *Id.* As with the 9512 Form, the candidate can be rated for each attribute on the 9512-A Form as "outstanding," "very good," "good," or "needs development." *Id.*

As with Keating, Geddes' 9512-A Form was completed by Geddes' first and second level managers (again Davis and Hardy); the 9512-A Form was signed by both managers on September 29, 1994. *Id.* Geddes was rated as "outstanding" in the attribute (1); "very good" in attributes (2) and (3); and "outstanding" in attribute (4). Apparently both managers concurred in these evaluations as there are no separate ratings marked by the division chief. *Id.*

Part I of both the 9512 Form and the 9512-A Form (the MAP Entry Level Resume) contains identical sections in which the candidate's awards and special achievements for the three years prior to the application are listed. For purposes of comparison, Keating's and Geddes' entries are listed below.

Keating received Distinguished Performance awards for the years 1991-1994 and a Special Act Award as RMD Manager of the Quarter. She assisted the district

---

[4] The subheadings which represent the criteria by which each attribute is analyzed are as follows: For attribute (1): communication, feedback, and persuasion. For attribute (2) the criteria are: leadership focus, strategic planning and systems, management and improvement. For attribute (3): consultation, ethics/integrity, and innovation. And for attribute (4): empowerment and valuing the human resource.

coordinator in the annual Combined Federal Campaign in 1991, and supervised the establishment of the Olympia Fields facility in 1991.

Geddes also received Distinguished Performance awards in 1993 and 1994; a Vision Award in 1993; and two Special Act awards in 1991.

*2. Performance evaluations of Keating and Geddes*

Another integral portion of the application submitted by each candidate was a current performance appraisal. Such an appraisal was submitted by both Keating and Geddes. Once again, there are some differences between the forms submitted by each.

Keating's submitted "Performance Management and Recognition System Appraisal" was completed on June 21, 1994 and covered the period extending from October 1, 1993 through February 5, 1994. Joint Ex. 9 at 319-21. The evaluation was performed by Davis and approved by the then-Chief of the Resources Management Division (signature illegible). *Id.* at 319. The evaluation portion of the form comprises two sections: (1) a Rating of Critical Elements-Manager; and (2) a Summary Rating. *Id.* Within the Rating of Critical Elements section, the evaluatee is rated across three separate elements: (1) Program Management and Accomplishments; (2) Managing Resources and Guiding Performances; and (3) Implementing and Managing Equal Employment Opportunity. For each element the evaluatee can be rated as either "exceeded," "met," or "failed to meet" the requirements of the applicable element. *Id.* Within the Summary Rating Section a candidate can be rated as "outstanding," "distinguished," "fully successful," "minimally successful," "unacceptable," or "unratable." *Id.* A rating of "failure to meet" in any of the three categories of the Rating of Critical Elements section

mandates that the evaluatee receive a rating of "unacceptable" in the Summary Rating section. *Id.*

Keating received evaluations of "exceeded" for elements (1) and (2) and a rating of "met" for element (3) in the Rating of Critical Elements section and a Summary Rating of "distinguished." *Id.*

Geddes was rated on a Performance Management and Recognition System Appraisal form that was substantially similar to that employed for Keating; however, the Ratings of Critical Elements section lacks the designation "Manager," and two of the elements are different from those in the form on which Keating was evaluated. Joint Ex. 10 at 322. Geddes' evaluation covered the period between October 1, 1993 and April 16, 1994. *Id.* at 219. Three elements are present in this section: (1) Program Management and Accomplishment (similar to Keating's form); (2) Quality of Communications; and (3) Quality of Expertise. *Id.* at 322. The Summary Rating section of this form is substantially identical to Keating's. *Id.*

Geddes was also evaluated by Davis on June 21, 1994, and the form was approved by the same anonymous Chief of the Resources Management Division on the same day. *Id.* In the Rating of Critical Elements section, Geddes received a rating of "exceeded" for elements (1) and (2) and a rating of "met" for element (3). *Id.* On the Summary Rating portion of the form, Geddes received a rating of "distinguished." *Id.*

The appraisals of both Keating and Geddes also contained a narrative portion, presumably written by Davis as the evaluator. Joint. Ex 9 at 320; Joint Ex. 10 at 219. The narratives address each of the three elements in the preceding Rating of Critical Elements section. These are generally laudatory in nature for both candidates, as might

be expected from the high ratings received by each.  No negative comments are to be found in either evaluation.

**B. Evaluation of Other Candidates**

A total of nine candidates (possibly ten if Duckworth is included) applied and were interviewed for the position at issue in the case.  Despite the application requirements specified in the vacancy posting, the candidates supplied several different types of MAP qualification documents.  All of the white candidates (1 male and 2 females) submitted 9512 Forms as part of their application packet.  All five of the African-American candidates submitted 9512-A Forms.  The remaining candidate, a female Hispanic, submitted a Form 9111.

**C. Required Educational and Experience Standards for the GS-13 Level Position**

Because the position at issue in this dispute was an entry-level management position, all candidates were required to be MAP certified by IRS Personnel Specialists. Moreover, to qualify for a GS-13 level position, the candidates had to meet required Group Coverage Qualification Standards for Administrative and Management Positions (the "Standards").  Joint Ex. 6 at 113.  These Standards established requirements of education and generalized or specialized experience for each GS pay grade level.  *Id.*  For GS-12 levels and above, there are no specified educational or general experience requirements.  *Id.*  Rather, those positions required at least one year's specialized experience equivalent to at least the next lower grade level (thus an applicant for a GS-13 level position would require at least one year's experience (or the equivalent) at the GS-12 level).  *Id.*

Specialized experience is defined in the Standards as experience that equips the candidate with the particular knowledge, skills, and ability to perform successfully in the duties of the position; typically that is accomplished by work experience that is in, or is related to, the work of the position to be filled. *Id.* at 114. To be creditable, specialized experience must have been equivalent to at least the next lower grade level in the normal line of progression for the occupation in the organization. *Id.*

Both Keating and Geddes had more than one year's experience at the GS-12 level, Keating as a GS-343-12 and Geddes as a GS-301-12.

## D. The "Town Hall Meeting"

Some time prior to the selection of the candidate for the position at issue in this case, a "Town Hall Meeting" was held for the staff of the Chicago IRS offices affected by the consolidation and reorganization of the IRS Regional and District Offices. At that meeting, Robert Brazzil ("Brazzil"), the Regional Director of Support Services, spoke to the assembled workers, including the witnesses who testified at trial (Brazzil himself did not testify at trial). Most of the witnesses at trial agreed to at least some version of what was said by Brazzil at the meeting, or were unable to recall his statements. Those witnesses who recalled his statements testified that he said words to the effect of that there was only one minority manager out of four positions in the Division, and that that was not as diverse as it should be, but that the remaining two open positions would be used to "get us where we should be." The witnesses, notably Keating herself and Lynn ("Barcutta") testified that those words made them feel as though Brazzil intended to hire a minority applicant for the positions.

**E. Testimony of Sharon Cullen (*née* Hornsby) ("Hornsby")**

Sharon Hornsby was the newly-appointed Director of Support Services of the Chicago Host Site and the person acknowledged by both plaintiff and defendant as the individual responsible for making the hiring decision for the newly created GS-343-13 position.  Together with Ray Hambaugh, Hornsby conducted the interviews, but the selection of the candidate was hers.  Hornsby testified that the key factor in selecting the candidate for the position was the interview.  Hornsby testified that Geddes had greater enthusiasm for leading the IRS personnel through the challenging process of consolidation and reorganization, that Geddes' interview had been "outstanding," and that Geddes was the "best person for the job."  Hornsby stated that Geddes responded very positively to feedback.  She testified that Keating, on the other hand, was a good technician but had not, in her current position, made a successful transition to management.  She further acknowledged that Geddes was not in the 343 category designator, but declared that since the position to be filled was an entry level management position, it was not necessary that the candidate be a GS-343-12.[5]  Hornsby denied that she had ever received instructions from Brazzil or other higher management to hire a minority individual for the job.  Finally, she stated that she did not consider the differences between the 9512 and 9512-A forms to be significant.

**F. Testimony of Ray Hambaugh**

Ray Hambaugh ("Hambaugh"), was Chief of the Facilities Management Branch ("FMB") under the new organizational plan and, together with Hornsby, interviewed the

---

[5] Four of the nine candidates for the position held the title of GS-343-12. The other applicants comprised a GS-301-12 (Geddes); a GS-235-12; a GS-512-12; a GS-391-12; and a GS-221-12. Joint Ex 7. All nine were categorized as "Best Qualified" by Carter, the IRS personnel specialist; however since there were less than ten applicants, all were capable of being so categorized.

applicants for the new GS-343-13 position. Hambaugh echoed the testimony of Hornsby, stating that the decision "all came down to the interview" and that Geddes gave the superior interview. He admitted that Keating had more managerial experience, whereas Geddes had "occasional experience" acting as manager in her superior's absence for periods of a few days or weeks. He stated emphatically that "diversity was not an issue to selection" of the candidate for the position.

However, evidence, in the form of an affidavit given by Hambaugh on February 28, 1995, was introduced by the plaintiff to impeach Hambaugh's testimony. In his affidavit, Hambaugh recited many of the reasons that he had testified to in court; that Geddes had the best interview in terms of "commitment to customer services, meet and deal qualities, enthusiasm for the position, and management style." Hambaugh Aff. 1 February 28, 1995. Both Keating and Geddes were "intelligent and articulate"; however Geddes had "the edge in interpersonal skills." *Id.* at 2. In the end, repeated Hambaugh, Geddes "presented the stronger position in terms of customer service, meet and deal qualities, poise, enthusiasm, and overall managerial philosophy." *Id.* at 3.

However, Hambaugh, in his affidavit, also declared that at the time of the interview, the management cadre of the Facilities Management Branch consisted of "three while [sic] males and one black female." *Id.* Additionally, Hambaugh stated, all of the white male managers were formerly assigned to the Regional Office. *Id.* Hambaugh testified that he was sensitive to these issues and had sought and received approval to advertise the GS-343-13 position (to which Keating and Geddes applied) "as a means of addressing these concerns–the open announcement would give everyone a chance to compete." *Id.* at 3-4. Hambaugh concluded by reiterating that once the

announcement was made, he was interested only in selecting the best candidate for the position, that again, it all came down to the interviews, and that Geddes had given the best interview and was duly selected.

## G. Testimony of Lynn Barcutta

Testimony was then heard from Lynn Barcutta ("Barcutta") who was the union steward for the Facilities management branch, as well as the Equal Employment Opportunity ("EEO") counselor. Barcutta testified to the fact that Brazzil's alleged statements at the Town Hall Meeting made her feel that the position was one designated to be filled by a minority candidate and that she was discouraged from applying. Barcutta also testified that she had filed an EEO complaint against Hornsby and that she had no knowledge of the difference between the 9512 and 9512-A Forms.

## H. Testimony of George Davis

George Davis testified that prior to the reorganization/consolidation of IRS Regional and District Offices 1994 he was the Branch Chief of the Facilities Management Branch with a grade level of GS-343-14.[6] *See also* Joint Ex. 16. Davis testified that Geddes' position as Davis' staff assistant was comparable, at least in managerial authority, to Keating's position. Geddes' duties were more general, he declared, whereas Keating's duties were more specific in nature. Davis testified that, although an excellent technician, Keating had not made a completely successful transition to management, frequently siding with the employees against management. Keating, he asserted, had difficulty dealing with EEO complaints, and expressed a readiness to step down from managerial duties. He also testified that although Keating's relations with

---

[6] Davis was not part of the management team that interviewed and selected the candidate for the vacancy at issue in this case.

customers were generally good, Keating lacked sight of the overall picture and was occasionally curt.

On the other hand, Davis declared, Geddes had broad and general knowledge of branch operations, saw the big picture, and had better communication skills. Like all of the other witnesses, and both parties, Davis could offer no suggestions as to why the 9512 and 9512-A Forms appeared to have been used differentially for black and white candidates for the job vacancy.

## II. FINDINGS OF LAW

Title VII of the Civil Rights Act of 1964 makes in unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (2006). Having conducted a trial on the merits, the sole remaining task accorded to the court is to determine whether the plaintiff is a victim of intentional discrimination.[7] *Hennessey v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1350 (7th Cir. 1995) (citing *Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th Cir. 1994)). The burden of so proving rests squarely on the plaintiff. Keating must demonstrate, by a preponderance of the evidence, that the proffered reason why Geddes was selected for the contested position was not the reason offered by Hornsby and Hambaugh, *viz.*, that Geddes clinched the position by virtue of a superior interview, but rather that the job was offered to Geddes because she is African-American and Keating is not. Furthermore, Keating must provide evidence of such pretext beyond mere

---

[7] Once an issue has proceeded to trial, the burden-shifting analysis prescribed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), falls away and the only question that the court addresses is whether defendant intentionally discriminated against plaintiff based on her race. *See Gehring*, 43 F.3d at 343

differences of interpretation over the comparative qualifications of Geddes and herself. As the Seventh Circuit held in *Millbrook v IBP, Inc.*, "evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." 280 F.3d 1169, 1180 (7th Cir. 2002) (internal citations omitted).[8]

A finding of intentional discrimination may be reached via combinations of direct and indirect evidence. *Troupe v. May Dep't Store Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Direct evidence, such as an acknowledgement of discriminatory intent by the defendant or its agents, is certainly strongly probative of the requisite intent. *Id.* (citing *Mojica v. Gannett Co.*, 7 F.3d 552, 561 (7th Cir. 1993) (en banc)). Such acknowledgements are, of course, extremely uncommon in today's workplace. More often, courts rely upon indirect circumstantial evidence to provide an inference of discriminatory intent. *Troupe*, 20 F.3d at 736.

In *Troupe*, the Seventh Circuit described three categories of potential indirect evidence that could permit an inference of intentional discrimination.[9] *Id.* The first

---

[8] In its *Millbrook* opinion, the Seventh Circuit quoted with approval the Fifth Circuit's holding in *Deines v. Texas Dept. of Protective and Regulatory Services*, 164 F.3d 277, 279 (5th Cir. 1999) ("[D]isparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as to virtually 'jump off the page and slap you in the face'") 280 F.3d at 1179.

[9] The Seventh Circuit's expansive definition of indirect evidence in *Troupe* has engendered considerable debate and criticism in a number of courts. *See, e.g. Schaffner v. Rush Presbyterian St. Luke's Hosp.*, No. 94 C 2471, 1996 WL 507246, at *5 n.8 (N.D. Ill. Sept. 4, 1996) (definition of circumstantial evidence improperly incorporates the indirect method and such evidence should be subject to the burden-shifting analysis of *McDonnel Douglas*, 411 U.S. at 802); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1089 (7th Cir. 2000) (the *McDonnel Douglas* analysis should be used to analyze indirect or "mosaic" evidence); *Huff v. UARCO*, 122 F.3d 374, 380 (7th Cir. 1997) (standard of proving pretext is the same under *Troupe* and *McDonnel Douglas*); *Jones v. City of Elgin*, No. 96 C 6920, 1998 WL 259538, at *7-8 (N.D. Ill, May 13, 1998) (adopting the reasoning of *Schaffner* and evaluating plaintiff's evidence via a *McDonnel Douglas* analysis); *See also Demick v. Joliet*, 135 F. Supp. 2d 921, 933 n.5 (N.D. Ill. 2001) *and Haywood v. Lucent Technologies*, 169 F. Supp. 3d 890, 910 n.5 (N.D. Ill. 2001) (both agreeing with *Huff* and *Schaffner* and

category consists of suspicious timing, ambiguous statements (oral or written), behavior toward or comments directed at other employees in the protected group, as well as other "bits and pieces from which an inference of discriminatory intent might be drawn." *Id.* (citing *Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 425 (7th Cir. 1992)). The second category comprises evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff, except in the determining characteristic (race, in this case), received systematically better treatment. *Troupe*, 20 F.3d at 736 (citing *American Nurses Ass'n v. Illinois*, 783 F.2d 716, 728 (7th Cir. 1986)). The third category consists of evidence that the plaintiff was qualified for the job in question but was passed over in favor of a person not having the forbidden characteristic and that the employer's given reason for the choice is merely pretextual and unworthy of belief. *Troupe*, 20 F.3d at 736 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507-08 (1993)). Each type of circumstantial evidence may be sufficient in and of itself to support a judgment for the plaintiff; however, bits of circumstantial evidence may also be used to compose a convincing mosaic of discrimination. *Troupe*, 20 F.3d at 736.

---

additionally characterizing the use of circumstantial evidence to directly establish discrimination as "oxymoronic," but nevertheless employing the *Troupe* analysis).

Moreover, there is good reason to employ the *McDonnell Douglas* approach in cases, such as the instant case, alleging "reverse" racial discrimination (intentional discrimination in favor of a member of a racial minority over a white plaintiff). Where *McDonnel Douglas* has been used to decide pretrial motions for summary judgment in such cases, the test has required white plaintiffs, as part of their prima facie case, to establish the existence of "background circumstances" that support "an inference that the defendant is one of those unusual employers who discriminates against the majority" or evidence "that there is something 'fishy' about the facts at hand." *See, e.g., Hefley v. Vill. of Calumet Park*, No. 06-3130, Slip Copy, 2007 WL 1838586, at *2 (7th Cir. 2007); *Phelan v. City of Chicago*, 347 F.3d 679, 685 (7th Cir. 2003). Such an analysis gives a perspective to such suits that would be useful to the court in the present case. However, because a number of cases have supported the Seventh Circuit's *Troupe* analysis, and therefore *Troupe* must still be considered good law in this circuit, this court will adhere to that precedent and employ the categories and standards enumerated in *Troupe*. *See, e.g., Bell v. EPA*, 232 F.3d 546, 553-54 (7th Cir. 2000); *Council 31, Am. Fed'n of State, County & Mun. Employees v. Doherty*, 169 F.3d 1068, 1072-73 (7th Cir. 1999); *Pafford v. Herman*, 148 F.3d 658, 665 (7th Cir. 1998).

Keating has adduced little credible direct evidence of intent to discriminate on the part of the defendant. The statement by Brazzil, at the Town Hall Meeting, to the effect of "the management team is not as diverse as it should be but we intend to remedy that through filling the management vacancies" might very possibly be construed as such evidence. Brazzil, however, did not testify at trial. As an agent of the defendant acting within the scope of his employment, Brazzil's statement could be admissible as the admission of a party opponent. FED. RULE EV. 801(d)(2)(C). However, Keating has produced no evidence to show that Brazzil's statement at the Town Hall constituted a directive to the managerial staff involved in the hiring process, and Hornsby, who made the hiring decision, explicitly denied that she had received any such instruction from Brazzil or any other of her superiors.

Hambaugh's affidavit, introduced to impeach his testimony on the witness stand, stated that he was sensitive to the lack of diversity in the FMB management cadre, but he stated that he used the announcement of the vacancy as a means of addressing these concerns (and presumably attracting minority candidates), and that once the announcement had been made, he was solely concerned with selecting the best candidate. At best, this might be considered as indirect evidence of intent to discriminate under the first *Troupe* category, but, by itself, it is insufficient to establish the requisite intent to discriminate. Moreover, the principal deciding individual was not Hambaugh, but Hornsby, who declared that she had been given no directions to hire a minority for the vacancy.

Both Hambaugh and Hornsby testified that Keating and Geddes were both strong candidates and that it was the interview that played the decisive role in the selection of

Geddes. Although the same questions were asked of all candidates, it was Hambaugh's and Hornsby's recollection that Geddes' performance in the interview was the superior of the two. Measuring the performance of a candidate during an interview is necessarily a subjective evaluation. Title VII does not proscribe outright the use of subjective evaluative criteria. However, if a plaintiff can adduce objective evidence indicating that the subjective criteria are a pretext for intentional discrimination, an employer's use of such criteria may cause it to be vulnerable to a discrimination charge. *Giacoletto*,, 954 F.2d at 427-28; *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1170 (7th Cir. 1998). As objective evidence, Keating offers the disparities between the 9512 and 9512-A Forms, the assertion that Geddes' job designator of GS-301-12 did not give her the requisite experience for the vacancy, and Hambaugh's affidavit stating that he was sensitive to the lack of racial and gender diversity in the FMB management cadre. It is not enough.

Both sides concede that the white candidates submitted the 9512 Forms and the African-American candidates submitted 9512-A forms. Neither party, nor any of the witnesses, could advance a reason why this occurred, although it was the plaintiff's opinion that the Form 9512-A was an "easier" form that would give the African-American candidates a comparative advantage in the evaluation process. The apparent distribution of 9512 and 9512-A Forms along racial lines is certainly troubling, but the court cannot find any qualitatively or quantitatively significant difference in the difficulty of the performance competencies measured. Granted, the language of the four MAP competencies in the 9512 Form reads more technically than do their counterparts in the 9512-A Form; however, plaintiff was unable to advance a theory that was either cogent or compelling as to how this made the 9512-A form "easier" on the evaluee. The

differences between the two forms do not achieve the requisite objective clarity necessary to establish a pretext for intentional discrimination. Both Keating and Geddes were evaluated by the same individuals (Davis and Hardy, neither of whom was part of the candidate selection process) and both received very similar ratings from Davis, their immediate supervisor. However, Keating's ratings by Hardy, her division chief, were significantly lower than those of Geddes

Furthermore, the 9512 and 9512-A Forms were not the only criteria by which the candidates were evaluated. The (at the time) most recent performance evaluations of Keating and Geddes were also part of the application packet. Again, there is some variation between the two evaluation forms, but the apparent difference does not appear to be significant in terms of the qualities that are evaluated. Keating and Geddes were both evaluated by the same individuals (Davis and the unknown second evaluator) and were rated similarly in the summary evaluations ("distinguished").

On paper then, at least, the two candidates do not seem to be so different as to support an inference that one was significantly better qualified than the other. Despite the apparent distribution of the 9512 and 9512-A Forms along racial lines, those Forms, and the performance evaluation forms, do not appear to be so different on their faces as to support the inference that the disparity gave a competitive advantage to the minority candidates.

Keating next contends that Geddes, with a GS-301-12 designation, was insufficiently qualified for the GS-343-13 position. However, both Keating and Geddes were certified by the same IRS personnel specialist (Carter) as being MAP eligible for the position, as were a number of other individuals who were grade level 12 but had different

designations.  Since all of the candidates were designated as "best qualified" for the position by the IRS' own personnel standards, the court reaches the conclusion that, by IRS standards, Geddes was as qualified for the position as were all the others candidates. The witnesses at the trial generally conceded that Keating had the superior technical skills in space management, but the consensus of testimony was that the position, which was an entry-level management position, required more in the way of leadership potential than technical skills, and that Geddes was the better of the two in that category.  Keating also contends that Geddes, with a 301 job category designation, was not in the normal line of progression to the 343 line and thus Geddes' experience was insufficient to qualify her for the promotion. But the description accompanying the job vacancy announcement, and the testimony at trial, indicated that the job was largely managerial in nature, and that Geddes, who acted in a managerial capacity at her then-current position, was sufficiently familiar with FMB operations to be eligible for the promotion.  Again, Keating has failed to advance sufficient objective evidence that would permit a reasonable fact finder to infer that the defendant intended to discriminate against her because of her race.

Finally, Hambaugh's affidavit, which stated that he was concerned with the past lack of diversity in the FMB management cadre does not, in itself, reasonably support an inference of intentional discrimination under the first or third *Troupe* categories.  Read on its face, the most plausible construction of Hambaugh's affidavit is that he intended to advertise the vacancy as widely as possible in order to attract as many minority and female candidates as possible; but that once the selection process began he attempted to make the selection based on the merits of the candidate. Moreover, even if one questions Hambaugh's integrity concerning his testimony on the stand, it was Hornsby who made

the ultimate decision to promote Geddes. Hornsby testified that she had no instructions to specifically hire a minority candidate, and plaintiff was unable to provide any evidence to refute her.

Keating has offered into evidence several facts that could reasonably be construed as suspicious. But she offers no direct evidence (as defined by *Troupe*) and insufficient indirect evidence to prove, by a preponderance of that evidence, that the IRS or its agents intentionally discriminated against her. Furthermore, she has not provided evidence of pretext so favorable to her case that there can be no dispute among reasonable persons of impartial judgment that she was clearly better qualified than Geddes for the position. *Millbrook*, 280 F.3d at 1180. Her putatative mosaic of circumstantial evidence fails for want of sufficient definitive pieces to make a convincing picture of intentional discrimination. For that reason, the defendant is entitled to a finding in his favor by the court.

### III. CONCLUSION

Keating has not provided sufficient direct or indirect evidence to meet her burden of proof in showing that the IRS, by promoting Geddes to the position, intentionally discriminated against her because of her race. This court therefore enters judgment in favor of defendant Paulson.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: October 25, 2007